UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY APRIL HERNANDEZ,<br><br>              Plaintiff,<br><br>      v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>              Defendant. | No.  2:12-cv-2605-KJN<br><br><br><br>ORDER |

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("Act").[1]  In her motion for summary judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was not disabled from January 1, 2008, through the date of the ALJ's decision.  (ECF No. 13.)  The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary judgment.  (ECF No. 18.)  Thereafter, plaintiff filed a reply brief.  (ECF No. 21.)

---

[1] This action was initially referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15), and both parties voluntarily consented to proceed before a United States Magistrate Judge for all purposes.  (ECF Nos. 6, 9.)

1

For the reasons that follow, the court denies plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary judgment, and enters judgment for the Commissioner.

I.      BACKGROUND

Plaintiff was born on March 13, 1985, has a high school education with special education classes, is able to communicate in English, and was deemed to have no past relevant work (although plaintiff reported having worked for some periods in retail and food service, including after the alleged disability onset date).[2]  (Administrative Transcript ("AT") 23, 28-29, 51-53, 63-64, 68-69, 175, 296-97.)  Around July 30, 2009, plaintiff applied for DIB and SSI, alleging that she was unable to work as of January 1, 2008, primarily due to developmental delay and disability.  (AT 21, 141-47, 148-54, 174.)  On October 8, 2009, the Commissioner determined that plaintiff was not disabled.  (AT 21, 70-74.)  Upon plaintiff's request for reconsideration, the determination was affirmed on August 18, 2010.  (AT 21, 79-83.)  Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which ultimately took place on July 12, 2011, and at which plaintiff (proceeding without counsel) and a vocational expert ("VE") testified.  (AT 21, 43-62.)

In a decision dated July 27, 2011, the ALJ determined that plaintiff had not been under a disability, as defined in the Act, from January 1, 2008, plaintiff's alleged disability onset date, through the date of the ALJ's decision.  (AT 21-30.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 7, 2012.  (AT 1-6.)  Thereafter, plaintiff filed this action in federal district court on October 19, 2012, to obtain judicial review of the Commissioner's final decision.  (ECF No. 1.)

II.     ISSUES PRESENTED

Plaintiff has raised the following issues: (1) whether the ALJ failed to properly credit the opinion of the consultative examiner concerning plaintiff's mental limitations; and (2) whether

---

[2] Because the parties are familiar with the factual background of this case, including plaintiff's medical and mental health history, the court does not exhaustively relate those facts in this order. The facts related to plaintiff's impairments and treatment will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

the ALJ failed to adequately develop the record.

III.   LEGAL STANDARD

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

IV.   DISCUSSION

    A.   Summary of the ALJ's Findings

The ALJ evaluated plaintiff's entitlement to DIB and SSI pursuant to the Commissioner's standard five-step analytical framework.[3] As an initial matter, the ALJ found that plaintiff

---

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. §§ 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

remained insured for purposes of DIB through June 30, 2010.  (AT 23.)  At the first step, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since January 1, 2008, plaintiff's alleged disability onset date.  (Id.)  At step two, the ALJ determined that plaintiff had the following severe impairments:  borderline intellectual functioning and a learning disorder.  (Id.)  However, at step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AT 25.)

Before proceeding to step four, the ALJ assessed plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant is limited by borderline intellect.  Specifically, she is limited to work involving simple instructions and one or two-step processes.

(AT 26.)

At step four, the ALJ found that plaintiff had no past relevant work.  (AT 28.)  Finally, at step five, the ALJ determined, in reliance on the VE's testimony, that considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could perform.  (AT 29.)  Specifically, the VE testified that plaintiff would be able to perform the following representative unskilled occupations: (1) cleaner, a medium work occupation with a specific vocational preparation ("SVP") of 1, and with 20,000

---

Step four:  Is the claimant capable of performing his past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

4

positions in California; (2) dishwasher, a medium work occupation with a SVP of 2, and 16,000 positions in California; and (3) fast food worker, a light work occupation with a SVP of 2, and 54,500 jobs in California.  (AT 29, 60-61.)

Accordingly, the ALJ concluded that plaintiff had not been under a disability, as defined in the Act, from January 1, 2008, plaintiff's alleged disability onset date, through the date of the ALJ's decision.  (AT 29.)

      B.      <u>Plaintiff's Substantive Challenges to the Commissioner's Determinations</u>

           1.      <u>Whether the ALJ failed to properly credit the opinion of the consultative examiner concerning plaintiff's mental limitations</u>

Plaintiff did not receive any treatment for mental health impairments, and thus the record contains no mental functional capacity assessment by a treating source.  However, plaintiff underwent a consultative psychological examination by Dr. L. Woodard, a licensed clinical psychologist.  (AT 295-302.)  Plaintiff contends that although the ALJ ostensibly gave Dr. Woodard's opinion significant weight, the ALJ improperly failed to credit certain material aspects of Dr. Woodard's opinion.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201-02 (9th Cir. 2001); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  <u>Id.</u>; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  <u>Lester</u>, 81 F.3d at 830-31.  In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons.  <u>Lester</u>, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported

1   examining professional's opinion (supported by different independent clinical findings), the ALJ
2   may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing
3   Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to
4   weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[4] except that the ALJ
5   in any event need not give it any weight if it is conclusory and supported by minimal clinical
6   findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory,
7   minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a
8   non-examining professional, without other evidence, is insufficient to reject the opinion of a
9   treating or examining professional.  Lester, 81 F.3d at 831.

10       In this case, Dr. Woodard performed a psychological examination of plaintiff on March 6,
11  2009.  (AT 295.)  Plaintiff arrived for the appointment on time and unaccompanied, having
12  travelled by bus.  (Id.)  She was dressed in casual, appropriate attire with adequate hygiene and
13  grooming, and exhibited normal posture with no evidence of physical discomfort, involuntary
14  movement, or other unusual mannerisms.  (Id.)  Dr. Woodard noted that plaintiff was cooperative
15  and pleasant, and appeared comfortable with the interview setting.  (Id.)  Plaintiff reported having
16  problems at work with slowness and listening to bosses, who frequently had to repeat
17  instructions, as a result of a learning disability.  (AT 295, 297.)

18      According to plaintiff, she graduated high school, but had been in special education
19  classes since the fourth grade.  (AT 295-96.)  She described having worked for some periods
20  primarily in retail and food service jobs.  (AT 296-97.)  Plaintiff denied having any other
21  psychiatric conditions, and also denied any substance abuse issues, stating that she only has rare
22  social alcohol and had tried cannabis twice at the age of 20.  (Id.)  Plaintiff further stated that she
23  had previously engaged in unprotected sex, and even though she could identify associated
24  dangers, she was unable to provide reasons for engaging in such activity.  (AT 296.)  As for daily
25  activities, plaintiff reported generally waking around 7:30 a.m. to an alarm that she set for herself,

---

[4] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization.  20 C.F.R. § 404.1527.

showering every other day without needing a reminder, managing hygiene needs, cooking simple meals, doing her own grocery shopping (although she claimed to not know the cost of basic food items), completing household chores, watching television, reading aloud, and writing in her journal.  (AT 297, 299.)

Dr. Woodard performed a mental status examination and conducted various psychological tests.  (AT 297-99.)  During the testing, plaintiff was fully alert and oriented, and displayed no signs of restlessness, fidgeting, inattention, or difficulty concentrating or focusing.  (AT 297-98.)  However, Dr. Woodard observed that plaintiff had mild receptive and expressive language difficulties, with responses frequently lacking in coherence, logical order, and obvious relevance, as well as displaying indecision and requiring minor additional explanation for testing instructions.  (Id.)  Plaintiff's speech was normal in volume and pitch, but with a halting rate, long response latency, and imprecise pronunciation.  (AT 298.)  The psychological test results showed significant variability, indicating a general weakness in verbal relative to non-verbal skills; with intact visuo-spatial processing and reasoning skills, but with verbal skills ranging from the low average to borderline levels.  (AT 299.)  Although plaintiff received extremely low scores on the working memory index, her memory was assessed as intact during additional testing for immediate, short, and long term recall.  (Id.)  Plaintiff's processing speed index was in the borderline range, indicating limitations in ability to quickly scan, extract, and encode information from the environment.  (Id.)  Perception and coordination testing indicated normal speed and coordination with no signs of organic irregularities.  (Id.)  Dr. Woodard found plaintiff to have impaired judgment and insight, as well as an extremely limited fund of information.  (Id.)

Dr. Woodard summarized plaintiff's condition as follows:

> Ms. Hernandez maintains moderately intact daily living skills relating to self care and daily routines.  Her occupational history indicates that she is able to find and maintain employment. However, she shows limited judgment and insight and is at risk of victimization due to her limited capacity to reason and problem solve in social situations.  In addition, she is likely to experience difficulty in the workplace due to slowness in cognitive processing and reasoning ability and initiative.  There was no apparent difficulty at interview with attention, concentration, and ability to focus; Ms. Hernandez remained focused throughout the testing session which lasted almost 3 hours and showed no signs of being

> distracted at any point in the interview.  Cognitive functioning was grossly intact; Ms. Hernandez appears to operate at an average to low average level of intellectual functioning, with superior non-verbal relative to verbal abilities.  This discrepancy is likely related to the effect of learning impairment which has limited acquisition of age appropriate vocabulary and fund of information.  This learning impairment is likely due to limited processing capacity.  These factors together likely have impacted reasoning capacity.

(AT 299-300.)  Dr. Woodard diagnosed plaintiff with a learning disorder not otherwise specified and assessed a GAF score of 54.[5]  (AT 300.)  He then made the following recommendations:

> 1. On the basis of the assessment of cognitive functioning as intact and Ms. Hernandez's ability to focus and concentrate both during the interview and in daily living and recreational activities, it is concluded that Ms. Hernandez is able to maintain concentration and attention sufficiently to understand, remember, and carry out simple one or two step instructions.  Her cooperative demeanor indicates that she is capable of interacting appropriately with co-workers, supervisors, and the public, since ability to conform to social standards appears intact.
>
> 2. Ms. Hernandez would benefit from vocational assessment, training, and support to identify appropriate employment niches that can provide accommodations for Ms. Hernandez's slower processing capacity and need for more intensive support and supervision in the workplace.
>
> 3. Ms. Hernandez has limited social supports and impaired social judgment, and would benefit from appointment of a guardian to supervise and assist with life choices.  Minimally she would benefit from psychosocial skills rehabilitation training to assist her with development of interpersonal skills such as the ability to identify and defend her personal rights, and self protection skills to address current potential for victimization.
>
> 4. Based on indications that budgeting knowledge and judgment may be limited, and that Ms. Hernandez is at risk of victimization or undue influence, it is recommended that Ms. Hernandez be assisted to handle any awarded benefits.
>
> 5. Ms. Hernandez's cognitive impairments are longstanding and unlikely to resolve.

(AT 300.)

---

[5] GAF is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).  A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id.

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for not crediting the portion of Dr. Woodard's opinion indicating that plaintiff would have difficulty in the workplace due to slowness in cognitive processing and would require more intensive support and supervision in the workplace. For the reasons discussed below, the court disagrees.

After summarizing Dr. Woodard's findings and test results, the ALJ stated that he gave significant weight to Dr. Woodard's opinion, noting that:

> Dr. Woodard opined that the claimant was able to maintain concentration and attention sufficiently to understand, remember, and carry out simple one or two-step instructions. She was capable of interacting appropriately with co-workers, supervisors, and the public. There are various recommendations outside the scope of this opinion, including that the claimant should have a vocational support and a guardian.

(AT 27-28.) Notably, the ALJ fully accepted and credited all of the concrete mental functioning limitations assessed by Dr. Woodard in paragraph 1 of his recommendations. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). Furthermore, the ALJ reasonably concluded that paragraphs 2-4 of the recommendations were outside the scope of Dr. Woodard's medical opinion as to mental functional capacity.

Paragraph 3 and 4 of Dr. Woodard's recommendations suggest assistance with life choices and handling of any awarded benefits. However, the fact that plaintiff may have impaired social judgment and may unwisely spend money, or potentially be victimized by others through undue influence, does not bear on her mental ability to perform other work in the national economy for purposes of the Act. While such concerns may well need to be addressed through other social programs, plaintiff provides no authority for the proposition that the Act requires the Commissioner to consider, for purposes of making a disability determination, how wisely and appropriately plaintiff may spend any funds earned through gainful activity. Importantly, Dr. Woodard did not opine that plaintiff's impaired judgment would somehow interfere with her performance of simple tasks or that she was incapable of appropriately interacting with co-workers, supervisors, and the public for purposes of performing work duties.

Paragraph 2 of Dr. Woodard's recommendations, which proposes "vocational assessment, training, and support to identify appropriate employment niches" to accommodate plaintiff's

1 "slower processing capacity and need for more intensive support and supervision in the
2 workplace" (AT 300), essentially recommends vocational support in finding particular jobs in
3 plaintiff's community for which she would be suited. This recommendation addresses the
4 practical reality that, although the Dictionary of Occupational Titles and its representative
5 occupations are used, as a matter of administrative necessity, by vocational experts and ALJs for
6 making benefits determinations in the administrative scheme, vocational support may often be
7 useful to identify "real-life" jobs in the community tracking such representative occupations.

8 Plaintiff contends that paragraph 2 contains limitations *additional* to the concrete
9 limitations outlined in paragraph 1 of Dr. Woodard's recommendations and adopted as part of the
10 RFC. However, paragraph 2's references to plaintiff's slower processing capacity and need for
11 more intensive supervision/support do not amount to concrete restrictions and instead appear to
12 describe general conditions or states. Moreover, such conditions are plausibly accounted for by
13 the ALJ's assessed RFC for work involving simple instructions and one- or two-step processes.
14 Simple, routine, repetitive work would logically require less intellectual processing, reasoning
15 ability, and initiative, as well as less supervision/support, compared to more complex work, which
16 would demand greater cognitive skills and for which plaintiff would likely require closer
17 supervision/support. When viewed as a whole, Dr. Woodard's opinion does not suggest that
18 plaintiff is incapable of performing simple tasks without significant supervision. Such an
19 interpretation is also consistent with Dr. Woodard's own observation that plaintiff's occupational
20 history (which includes jobs comparable to the representative occupations identified by the VE)
21 "indicates that she is able to find and maintain employment." (AT 299.)

22 Additionally, the ALJ's RFC is consistent with the opinion of the non-examining state
23 agency psychiatrist, Dr. Haroun, who reviewed Dr. Woodard's report and other record evidence,
24 and opined that plaintiff was capable of performing simple repetitive tasks; remembering
25 locations and work-like procedures; maintaining attention and concentration for extended periods;
26 performing activities within a schedule; maintaining regular attendance and punctuality with
27 customary tolerances; sustaining an ordinary routine without special supervision; and interacting
28 appropriately with the general public, supervisors, and co-workers. (AT 256-59.)

To be sure, plaintiff urges the court to adopt an alternative possible interpretation of Dr. Woodard's opinion. Nevertheless, to the extent that there is any ambiguity, the court defers, as it must, to the ALJ's reasonable and rational interpretation of Dr. Woodard's opinion.

### 2. Whether the ALJ failed to adequately develop the record

Plaintiff further argues that the ALJ failed to adequately develop the record, particularly in light of the fact that plaintiff was unrepresented at the administrative hearing.[6] That argument lacks merit.

"The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered ... even when the claimant is represented by counsel.'" Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003) (citing Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). "When the claimant is unrepresented, . . . the ALJ must be especially diligent in exploring for all the relevant facts." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). A heightened duty to fully develop the record applies when a claimant suffers from mental impairments and may be unable to protect her own interests. Id.

In this case, plaintiff faults the ALJ for not further pursuing certain lines of questioning concerning plaintiff's mental symptoms and functioning. However, plaintiff fails to show any resulting prejudice – plaintiff described her mental conditions and alleged symptoms in detail to

---

[6] Plaintiff's initial administrative hearing was scheduled for April 20, 2011. When plaintiff appeared at that hearing without counsel and stated that she did not understand the previously-sent notice regarding her right to be represented at the hearing, the ALJ carefully explained and outlined the contours of that right, the steps to take to obtain representation, and organizations that could assist plaintiff. Plaintiff indicated that she understood her rights, and the ALJ then granted her an extension of time to obtain counsel, specifically cautioning plaintiff that no further extensions would be granted. (See AT 35-42.) Subsequently, at the rescheduled July 12, 2011 hearing, plaintiff again appeared without representation, stating that she was trying to find a doctor first and referencing what she described as her "really high" scores on the psychological tests. (AT 43-46.) The ALJ then proceeded with conducting the hearing. Although plaintiff argues that plaintiff did not validly waive her right to counsel, the court need not address that argument, because it finds, for the reasons discussed below, that no prejudice or unfairness resulted from plaintiff's lack of representation. See Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985) ("Lack of counsel does not affect the validity of the hearing unless the plaintiff can demonstrate prejudice or unfairness in the administrative proceedings."); Hall v. Sec'y of Health, Educ. & Welfare, 602 F.2d 1372, 1378 (9th Cir. 1979) ("The claimant must demonstrate prejudice or unfairness [based on absence of counsel] in the administrative proceedings to be entitled to relief by way of remand.").

1  consultative examiner Dr. Woodard, who prepared a thorough report concerning plaintiff's

2  functioning that was reviewed and considered by the ALJ.  Plaintiff had also submitted several

3  disability reports, describing her impairments and alleged limitations, which were included in the

4  record.  Furthermore, the ALJ gave plaintiff multiple opportunities at the hearing to add any

5  additional information that the ALJ specifically failed to ask about.  (AT 60-61.)  The ALJ also

6  inquired whether plaintiff wanted her mother to testify, and plaintiff declined.  (AT 61.)  Thus,

7  the court finds that plaintiff had a fair opportunity to address her impairments, symptoms, and

8  alleged functional limitations.

9        Plaintiff also argues that the ALJ erred in failing to order plaintiff's educational records.

10  However, plaintiff does not articulate how obtaining those records would have changed the

11  outcome of her case, given that the ALJ apparently accepted plaintiff's representations that she

12  had attended special education classes, and accordingly found that she had severe impairments of

13  borderline intellectual functioning and a learning disorder.  (AT 23.)  Moreover, plaintiff's

14  request for a remand based on the lack of educational records is somewhat specious, because such

15  records were never presented to the Appeals Council.  Even if plaintiff, as a pro se litigant, did

16  not know to present her educational records to the ALJ, plaintiff was subsequently represented by

17  counsel before the Appeals Council, but nevertheless elected not to submit the records.

18        To the extent that plaintiff argues that the ALJ improperly discounted her credibility based

19  on a lack of educational and treatment records, any such error was harmless.  See Curry v.

20  Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1990) (harmless error analysis applicable in judicial

21  review of social security cases).  Here, the ALJ provided several other specific, clear, and

22  convincing reasons for finding that plaintiff's symptoms and functional limitations were not as

23  severe as she alleged.  See Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (harmless error

24  when ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also

25  provided valid reasons that were supported by the record).

26        In this case, the ALJ specifically pointed to plaintiff's generally good activities of daily

27  living, which were "greater than one would expect for a totally disabled individual":

28  ////

> She is able to maintain her hygiene, prepare some meals, and do household chores. She can clean her apartment, including washing dishes, cleaning part of her room, sweeping, and mopping. She also reported that she can clean the bathroom [Exhibit 6E]. She can go to the grocery store and can shop without problems. She is able to use public transportation. She also reported that she can use a computer. [*Id.*]. She testified that she is able to write in a journal and can write for three to four hours. The claimant is able to visit her aunt.

(AT 27.) "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting . . .. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina, 674 F.3d at 1112-13 (citations and quotation marks omitted).

In a similar vein, the ALJ observed that plaintiff's work after the alleged disability onset date, although not representing disqualifying substantial gainful activity, nonetheless indicated that her daily activities have been greater than alleged. (AT 27.) Indeed, plaintiff testified that she had most recently worked at an Arby's in Sparks, Nevada in July 2009, where she waited on customers, worked as a cashier, and wiped down tables. (AT 51-52.) According to plaintiff, she quit her job there because she was homeless and decided to move to California to be helped by her family. (AT 52, 174.)

Furthermore, as the ALJ pointed out, there were several other inconsistencies in the record. (AT 27.) See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (holding that ALJ may consider inconsistencies in the claimant's testimony/statements or between her testimony/statements and conduct when evaluating credibility). Despite claiming disability based on mental impairments, plaintiff, upon being questioned as to whether she had any problems that would affect her ability to work, testified: "No, but I – well, I have – I don't know if this is an excuse or what, but lately I've been having really bad back problems." (AT 53.) However, during a consultative examination by a board certified specialist in orthopedics, Dr. Theodore Georgis, plaintiff was assessed with no physical limitations. (AT 262-65.) Additionally, although plaintiff told Dr. Georgis that she did not take any drugs and told Dr. Woodard that she

13

1 had no substance abuse issues (only having tried marijuana twice at the age of 20), plaintiff
2 testified at the hearing that she had used marijuana and crystal methamphetamine earlier that year.
3 (AT 59-60, 263, 297.)

Also, the ALJ permissibly found that plaintiff's alleged disability was inconsistent with the opinion of consultative examiner and clinical psychologist Dr. Woodard (as rationally interpreted by the ALJ) and the opinion of state agency psychiatrist Dr. Haroun. (AT 27-28.)

Finally, most of the above reasons for discounting plaintiff's credibility are equally germane to the statement of plaintiff's brother, who essentially echoed plaintiff's own testimony and statements. As such, any error in not explicitly re-stating, or incorporating by reference, the reasons given for discounting plaintiff's testimony with respect to plaintiff's brother was harmless and remand is not warranted. See Molina, 674 F.3d at 1115-22.

## V.  CONCLUSION

For the foregoing reasons, the court finds that the ALJ's decision was free from prejudicial error and supported by substantial evidence in the record as a whole. Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 13) is DENIED.

2. The Commissioner's cross-motion for summary judgment (ECF No. 18) is GRANTED.

3. Judgment is entered for the Commissioner.

4. The Clerk of Court is directed to close this case and vacate all dates.

IT IS SO ORDERED.

Dated: January 9, 2014

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE